UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LINCARE HOLDINGS INC.,

    Plaintiff,

v.                                                  Case No: 8:14-cv-2507-T-36AEP

GOLDEN SHORELINE LIMITED
PARTNERSHIP,§

    Defendant.
_____/

## **ORDER**

This matter comes before the Court upon the Plaintiff's Motion for Preliminary Injunction (Doc. 3), and Defendant's response thereto (Doc. 19). Oral argument was held on October 31, 2014. In the motion, Plaintiff states that, due to restrictive covenants, it is entitled to an injunction prohibiting Defendant from constructing an apartment complex on Defendant's land. The Court, having considered the motion and being fully advised in the premises, will deny Plaintiff's Motion for Preliminary Injunction.

**I.**     **STATEMENT OF FACTS**

In 1999, Defendant Golden Shoreline Limited Partnership ("Golden") and its affiliate, H.B. Showe Builders of Florida, Inc. ("Showe") owned approximately 32.89 acres west of U.S. Highway 19 in the City of Clearwater. Doc. 20 at ¶ 3. Golden and Showe executed and recorded a Declaration, which reflected that Golden, the Developer, owned the parcels known as Phase 1 and Phase 2, and Showe owned the parcel known as Phase 3. *Id.* at ¶¶ 4, 6; Doc. 1-1.

The Developer's Parcel, consisting of Phases 1 and 2, and Phase 3 are collectively defined as the "Office Park" in the Declaration. Doc. 1-1 at §1.1(e). The Developer's Parcel and Phase 3 are each individually defined as a "Parcel" in the Declaration. *Id.* at §1.1(g). The Declaration

defines an "Owner" as "the record holder of fee simple title to a Parcel, its heirs, legal representatives, successors and assigns." *Id*. at §1.1(f).

The express "Purpose" of the Declaration is stated as follows: "The parties plan to develop and operate the Office Park as an integrated office park complex for the mutual benefit of all real property in the Office Park and, therefore, hereby establish the Restrictions." *Id.* at §1.3.

In §5, the Declaration expressly identifies the specific uses that are permitted or prohibited on the property:

> 5. USE RESTRICTIONS
>
> 5.1 **Permitted Uses:** Phase 3 may be used solely for the construction and operation of one or more office buildings, together with related parking facilities, landscaping and other related facilities and for no other purpose or use whatsoever, subject however, to the easements and other rights therein as more particularly provided herein. Notwithstanding any provision in this Declaration to the contrary, the restriction with respect to the use of Phase 3 as provided in the immediately preceding sentence shall terminate and be of no further force and effect in the event that Developer should elect to permanently change the use of any portion of the Developer's Parcel.
>
> 5.2 **Prohibited Uses:** In furtherance and not in limitation of the provisions of Section 5.1 above and/or to the extent that such restriction set forth in Section 5.1 should terminate, no portion of the Office Park shall ever be used or occupied as a meeting hall; bingo hall or a place of public assembly; automotive maintenance or repair facility; for industrial purposes; skating or roller rink; bowling alley; sales of boats, trailers, automobiles or other vehicles; cocktail lounge or bar serving alcoholic beverages (though a full service restaurant located on any office building may serve alcoholic beverages as an ancillary service); funeral parlor; massage pallor; animal clinic; discotheque; dance hall; car wash; gas station; off-track betting establishment; amusement or game room as a primary use; so-called "flea market"; second-hand or used goods store; poo room; so-called "head shops"; night club; training or educational facility or other operation catering primarily to students or trainees as opposed to customers (though such use shall be permitted as a use ancillary to general office use); gun range; any business or use which emits offensive odors, fumes, dust or vapors, is a public or private nuisance, emits loud noise or sounds which are objectionable, or

>   creates fire, explosive or other hazard; warehousing; or adult book store or store selling or exhibiting pornographic materials.

Doc. 1-1. The Declaration also provides, *inter alia*, for cross easements of ingress and egress in §3.1.

The restrictions and covenants set forth in the Declaration (the "Restrictions", as defined in §1.1(j) of the Declaration) run with the land as a burden upon each Parcel and for the benefit of the fee simple owners of each Parcel, and, together with the Declaration, ". . . shall inure to the benefit of the Owners, their heirs, legal representatives, successors and assigns, and upon any person acquiring a Parcel, or any portion thereof, or any interest therein . . ." *Id.* at §§6.1, 6.2.

On or about February 15, 1999, Lincare, as Buyer, and Showe, as Seller, entered into an Agreement for Purchase and Sale with respect to Phase 3. On or about December 13, 1999, Lincare acquired fee simple title to Phase 3 (also sometimes hereinafter referred to as the "Lincare Property") from Showe via Special Warranty Deed (the "Deed") recorded on December 14, 1999, in Official Records Book 10753, Page 2398 of the Public Records for Pinellas County, Florida, thus becoming Showe's successor and assign and the Owner of Phase 3 under the Declaration. Lincare subsequently constructed its corporate headquarters (the "Lincare Facility") on Phase 3, which has been in operation since 2001.

On or about July 1, 2014 The Richman Group of Florida, Inc. ("Richman"), the proposed developer of an apartment complex on the Developer's Parcel, asked Lincare to approve and execute a proposed amendment to the Declaration that would specifically add language regarding the use of the Developer's Parcel as a multi-family residential development. *See* Doc. 1-10. By letter dated July 10, 2014, Lincare advised Golden and Showe that Lincare had a "vested interest" in maintaining the commercial character and use of the Office Park and would not consent to Richman's proposed amendment. *See* Doc. 1-12.

On August 20, 2014, the City of Clearwater issued a Development Order permitting Golden to proceed with the Proposed Redevelopment on Phase 2 of the property. *See* Doc. 1-13. Lincare subsequently filed an Appeal Application with the City of Clearwater seeking to appeal the Development Order (the "Appeal Application"). *See* Doc. 1-14. On August 29, 2014, Lincare sent a Notice Letter to Golden, Showe and Richman stating that the Proposed Redevelopment violates the Declaration and that Lincare intended to enforce all of its rights and remedies pursuant to §6.4 of the Declaration. *See* Doc. 1-15.

Golden responded to the Notice Letter confirming its intention to proceed with the Proposed Redevelopment and denying any violation of the Declaration. *See* Doc. 1-16. Golden maintained that Lincare's consent is not required for Golden's proposed use conversion and that there are no restrictions on the permitted use of the Developer's Parcel. *Id.* Golden also maintained that the last sentence of §5.1 of the Declaration expresses or implies that there are no permitted use restrictions on the Developer's Parcel, and that the Owner of the Developer's Parcel has the unilateral right to change the use of the Developer's Parcel without first obtaining the consent of the Phase 3 Owner.

Golden had been leasing seven buildings on the Developer's Parcel, and receiving rental income. In preparation for the sale to Richman, Golden terminated or declined to renew all of the commercial leases on the Developer's Parcel. Doc. 20 at ¶ 22. As a result, Phase 2 of the Developer's Parcel is 85% vacant in anticipation of closing the sale with Richman. *Id*. at ¶ 23. The two remaining tenants' leases on Phase 2 are scheduled to expire in December 2014 and July 2015. Golden alleges that it will lose $112,254 in rental income if the Purchase Agreement does not close by November 17, 2014. *Id.* at ¶ 24.

Golden is also the mortgagor of a real estate loan provided by Nationwide Life Insurance Company and secured by the Developer's Parcel. *Id*. at ¶ 25. Last year, Nationwide Life Insurance Company reduced the interest rate and agreed to accept a loan payoff amount at a substantial discount (millions of dollars) if that reduced amount is paid on or before December 26, 2014. *Id*. Golden entered into and coordinated the Purchase Agreement with Richman for the purpose of using the proceeds of the sale to pay off the real estate loan, at significant savings. *Id.* Golden alleges that it will suffer damages exceeding $2,500,000 if it loses the ability to fund the discounted loan payoff by December 26, 2014. *Id.*

## II.     STANDARD OF REVIEW

A district court may issue a preliminary injunction where the moving party demonstrates: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establish[es] the burden of persuasion as to each of the four prerequisites." *Id.* (internal citations and quotations omitted). "Failure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits." *ACLU of Fla., Inc. v. Miami-Dade County Sch. Bd.,* 557 F.3d 1177, 1198 (11th Cir. 2009).

"The purpose of … a preliminary injunction is 'merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *United States v. Lambert*, 695 F.2d 536, 539-40 (11th Cir. 1983) (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). In

considering a request for a preliminary injunction, the Court may rely on hearsay materials that may not be admissible to support an order of permanent injunctive relief "if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (citations omitted).

## III.  DISCUSSION

Lincare filed a Complaint seeking injunctive and declaratory relief and a Motion for Preliminary Injunction on October 3, 2014. In the Motion, Lincare seeks a preliminary injunction that would prevent the construction of an apartment complex on the Developer's Parcel. To obtain this injunction, Lincare must first show that it is likely to succeed on the merits of its claim that Defendant's proposed development will violate the Declaration. *See Four Seasons Hotels,* 320 F.3d at 1210. Lincare has failed to make this showing, thus, the Motion for Preliminary Injunction must be denied. *See ACLU of Fla.,* 557 F.3d at 1198.

Under Florida law, property owners have certain rights to impose restrictive covenants that run with the land and restrict the use of property. *See Chick-Fil-A, Inc. v. Cft Dev.*, LLC, 652 F. Supp. 2d 1252, 1260 (M.D. Fla. 2009); *Fiore v. Hilliker,* 993 So. 2d 1050, 1053 (Fla. 2d DCA 2008); *Hagan v. Sabal Palms, Inc.,* 186 So. 2d 302, 307 (Fla. 2d DCA 1966). Restrictive covenants are interpreted under the same general principles as contracts. *Chick-Fil-A, Inc.*, 652 F. Supp. 2d at 1260.  The interpretation of restrictive covenants is a matter of law for the court. *Royal Oak Landing Homeowner's Ass'n, Inc. v. Pelletier*, 620 So. 2d 786 (Fla. 4th DCA 1993).

Florida courts have held that, when interpreting covenants like those at issue here, the court "must look at the document as a whole to determine the intent of the parties." *Robins v. Walter,* 670 So. 2d 971, 974 (Fla. 1st DCA 1995). Reading the Declaration, here, as a whole, it is clear that the drafters and parties to the Declaration intended for Phase 3 to be developed as, and indefinitely

6

remain, an office park. Section 5.1 of the Declaration unambiguously indicates that Phase 3, the Lincare Property, may be used solely for the operation of one or more office buildings. No such restriction exists as to Phases 1 and 2. Instead, the Declaration, generally, refers to the Developer's Parcel, Phases 1 and 2, and Phase 3, collectively, as an "Office Park." *See* Doc. 1-1, Definitions. Further. The purpose of the Declaration is to develop and operate an office park complex. *See* Doc. 1-1. Construing the Declaration as a whole, it appears that the parties also intended for Phases 1 and 2 to be originally developed as an office park. However, it is unclear as to what was expected to become of Phases 1 and 2 in the future.

As Defendant notes, there are statements in the Declaration which evidence the contemplation of Phases 1 and 2 eventually being used for purposes other than an office park. For example, the last sentence in §5.1 states "Notwithstanding any provision in this Declaration to the contrary, the restriction with respect to the use of Phase 3 as provided in the immediately preceding sentence shall terminate and be of no further force and effect in the event that Developer should elect to permanently change the use of any portion of the Developer's Parcel." Plaintiff contends that this sentence creates an illusory promise and, therefore, should be severed from the Declaration.

"Where one party retains to itself the option of fulfilling or declining to fulfill its obligations under the contract, there is no valid contract and neither side may be bound." *Feldkamp v. Long Bay Partners, LLC,* 773 F. Supp. 2d 1273, 1283 (M.D. Fla. 2011). *See also Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1311 (11th Cir. 1998) (finding a contract illusory when "one of the promises appears on its face to be so insubstantial as to impose no obligation at all on the promisor-who says, in effect, 'I will if I want to.'").

Plaintiff's argument seems to be that the last sentence in §5.1 gives Golden free reign to make any use of Developer's Parcel it wants and, therefore, Golden is essentially making no promises at all. However, the obligations placed on Golden in the Declaration, including maintenance of the easements and liability insurance, are not released by this statement. Further, the restrictions in §5.2 can be interpreted to apply to the entire office park, including the Developer's Parcel. As discussed below, no language in the Declaration obligates Golden, as Plaintiff insists, to maintain its parcel as an office park. Instead, it is Plaintiff who is being released from obligations by this sentence.

Reading the Declaration as a whole, there are also significant omissions that support Defendant's position. Section 5.1, titled "Permitted Uses" indicates that Phase 3 may be used solely for office buildings. There is no corresponding provision in the entire Declaration related to the other phases. Section 5.2, "Prohibited Uses", then contains a finite list of prohibited uses – and residential use is not listed. It is unclear whether §5.2 was intended to apply to all phases or just Phase 3 – but either way it does not prohibit residential use. The parties who prepared and executed the Declaration obviously knew how to restrict usage of a parcel, and if they had intended to prevent Phases 1 and/or 2 from being used for residential purposes, they could have easily made that clear in the Declaration.

Plaintiff refers the court to §2.2(b), which requires that each Owner shall maintain the Owner's Parcel in a condition comparable to that of other office parks of comparable size and character in Pinellas County, Florida. Plaintiff claims that this requirement shows that the entire property was to be maintained as an office park, and that a residential property cannot be maintained in a condition comparable to an office park. However, Plaintiff ignores the indication

that all of §2 applies only to "Phase 3 Development." Again, this does not impact the use of the Developer's Parcels.

Plaintiff further argues that this case is analogous to *Blue Reef Holding Corp. v. Coyne*, 645 So.2d 1053 (Fla. 4th DCA 1994). However, in *Blue Reef*, the restrictions in question specifically stated that the land at issue would be reserved *only* for recreational purposes. *Id.* at 1054. Here, there is no similar language applicable to Phase 1 or 2. Notably though, the Declaration here does contain similar language applicable to Phase 3 – showing that the parties knew how to restrict the use of a parcel had they wanted to. They did not do so with regard to Phases 1 and 2.

Plaintiff also suggests that the proposed development will interfere with Lincare's easement rights. *See* Doc. 1 at ¶¶ 18-19, 32, and 47. However, the proposed development contemplated by the City of Clearwater's Development Order FLD2014-06016, dated August 20, 2014, only includes development of Phase 2 and will not impair the ingress/egress easement rights of Lincare. *See* Doc. 1-3. Lincare is simply assuming that the developer will next want to develop Phase 1 and that development will interfere with Lincare's easement rights. This possibility is too speculative to support an injunction.

As Plaintiff has failed to establish the burden of persuasion as to a substantial likelihood of success on the merits, Plaintiff's Motion for Preliminary Injunction will be denied. Having determined that Plaintiff has failed to establish the first factor, the Court need not address the remaining three factors.  Accordingly, it is hereby

**ORDERED** that Plaintiff's Motion for Preliminary Injunction (Doc. 3) is DENIED.

**DONE AND ORDERED** in Tampa, Florida on November 14, 2014.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

9

Copies to:
Counsel of Record and Unrepresented Parties, if any